## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Kid Stuff Marketing, Inc.,**

       **Plaintiff,**

**v.**                                       **Case No. 15-2620-JWL**

**Creative Consumer Concepts, Inc.**
**and Steak N Shake Operations, Inc.,**

       **Defendants.**

## MEMORANDUM & ORDER

In this lawsuit, plaintiff asserts that defendants infringed on its copyrights in certain illustrated characters, assembly instructions and a die line associated with paperboard cars that defendant Steak N Shake Operations, Inc. ("SNS") distributed to consumers in connection with its kids' meal program. This matter is presently before the court on the parties' motions for summary judgment. The parties have filed cross-motions on the issues of whether SNS enjoys an irrevocable implied license to use the character copyrights and whether the assembly instructions and die line copyrights are valid. Plaintiff also moves for summary judgment on the issue of ownership of the asserted copyrights. As will be explained, both motions are granted in part and denied in part.[1]

### I.    Standard

---

[1] Defendants have recently filed a motion for oral argument (doc. 132) on the parties' motions. Because the court does not believe that oral argument would be helpful here, the court denies that request.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and make inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, "the nonmoving party must present more than a scintilla of evidence in favor of his position." *Id*. (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177–78 (10th Cir. 2008)).

The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Cr. Bank*, 226 F.3d 1138, 1148 (10th Cir. 2000).

## II.     Statement of Facts

In August 2008, defendant Steak N Shake Operations, Inc. (hereinafter "SNS") began exploring ways to revamp its kids' meal program. Toward that end, Karen Cunningham, SNS's senior marketing manager, issued a Request for Proposals to various marketing entities, including plaintiff Kid Stuff Marketing, Inc. (hereinafter "KSM"). In preparing a presentation for SNS, KSM's then-CEO Joseph Tindall inquired as to whether SNS wanted KSM to explore the use of characters in connection with the kids' meal program. Ms. Cunningham indicated

that SNS would like to see characters as part of the presentation.  Mr. Tindall instructed KSM's senior creative director Michael Oden to create and develop characters for inclusion in the presentation to SNS.  Ultimately, Mr. Oden reached out to Mike Dammer, a freelance artist, to illustrate two animated characters patterned after popular food items sold at SNS.  These characters came to be known as "Sizzle" and "Shaker."  The versions of those characters that were ultimately copyrighted by KSM are shown in Exhibit A, attached hereto.  Mr. Dammer executed a work-for-hire agreement in April 2016, an agreement that KSM contends memorialized the terms of the parties' agreement at the time Mr. Dammer illustrated Sizzle and Shaker.

In September 2008, Mr. Tindall and other KSM representatives presented their proposal to SNS's management team.  The presentation included the Sizzle and Shaker characters, as well as the introduction of paperboard cars.  These "Classic Cruiser" cars, intended for distribution to children purchasing kids' meals and for easy assembly in the restaurant, were patterned after real cars manufactured by Ford and General Motors and were produced under license from those companies.  After viewing KSM's presentation and proposal, SNS selected KSM as the vendor for its kids' meal program.

SNS placed its first order with KSM in October 2008.  This initial order included Classic Cruisers as well as placemats and cups that included animated girl and boy characters developed by KSM.  The order did not include any items with Sizzle and Shaker.  In the meantime, a senior designer at KSM, Jay Thompson, created another illustrated character for potential use with the SNS work—a "female" character patterned after French fries.  This character came to be called

"Goldie."  The version of Goldie that was ultimately copyrighted by KSM is shown in Exhibit B, attached hereto.

In February 2009, KSM put together another presentation for SNS, featuring Sizzle, Shaker and Goldie and SNS placed its first order for products incorporating these characters in August 2009.  That order called for KSM to develop a double-sided placemat featuring the SNS kids' meal menu, various activities, and the Sizzle, Shaker and Goldie characters.   SNS then used another company to manufacture the placemats that were designed by KSM.  In October 2009, SNS placed its second order for products incorporating the Sizzle, Shaker and Goldie characters.   That order called for KSM to develop the artwork for a new paper kids' cup that would feature the characters.   As with the placemat design, SNS used another company to manufacture the cups that were designed by KSM.

In the spring of 2010, SNS approached KSM about ways to reduce the cost of the kids' meal program.   In response to that inquiry, KSM proposed reducing the size of the Classic Cruisers to make them less expensive and creating original car designs that did not require the payment of license fees to Ford and GM.  Toward that end, William Billen, KSM's director of product development, together with KSM's creative team, began creating original, non-licensed cars used in connection with SNS's kids' meal program.  In May 2010, SNS placed its first order for KSM's original, non-licensed car designs.  These cars were known as the Custom Non-Licensed Steak 'n Shake Cruisers.

SNS continued to order original, non-licensed cars from KSM through early 2014.  In 2012, KSM developed a new five-panel design for its original, non-licensed cars that permitted KSM to incorporate additional design features and graphics.  These cars featured one or more of

4

the Sizzle, Shaker and Goldie characters and typically focused on a specific theme. For example, the first five-panel cars that KSM produced for SNS were known as the Super Hero Cars, which were produced in April 2012. Later, KSM produced additional five-panel cars for SNS, including cars known as the Futuristic Cars. Mr. Billen created the "die line" for the Futuristic Cars and that die line is known as the 9015 Concept Car die line.[2]  That die line is shown in Exhibit C, attached hereto. Mr. Billen also created assembly instructions for the Futuristic Cars. Those written instructions, which were designed for a child's understanding, are known as the 9015 Concept Car Instructions. The 9015 Concept Car Instructions also include one illustration for each of the eight separate assembly steps. The assembly instructions as they appeared on the paperboard cars are shown in Exhibit D. The eight illustrations were created by James Kresge, a freelance artist. Mr. Kresge, like Mr. Dammer, executed a work-for-hire agreement in April 2016, an agreement that KSM contends memorialized the terms of the parties' agreement at the time Mr. Kresge created the assembly illustrations.

In April 2014, SNS notified KSM that it had received a proposal from a competing vendor to supply paperboard cars at a lower cost. Despite negotiations between SNS and KSM, SNS moved its kids' meal marketing business to that competing vendor, defendant Creative Consumer Concepts, Inc. (hereinafter "C3"). C3 began supplying paperboard cars to SNS in early 2015. According to KSM, these cars (known as the Spy Series cars) incorporate the characters designed by KSM as well as the assembly instructions/illustrations created by KSM. KSM further asserts that the Spy Series cars were created from the die line created by KSM for

---

[2] A die line is a template used in the manufacturing process in which a steel cutting die is created to form cuts, folds and perforations in specific places dictated by the template.

its Futuristic Cars.   In the pretrial order, KSM contends that C3 has produced additional infringing cars for SNS.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## III.    Discussion

In the pretrial order, KSM alleges that SNS and C3 infringed KSM's copyrights in the Sizzle, Shaker and Goldie characters; in the paperboard car assembly instructions (the 9015 Concept Car Instructions); and in the paperboard car die line (the 9015 Concept Car die line) by preparing, selling and distributing paperboard cars that were manufactured using KSM's Concept Car die line and featured the Sizzle, Shaker and Goldie characters as well as the Concept Car assembly instructions.   KSM further alleges a contributory copyright infringement claim against SNS on the grounds that SNS made the artwork for the characters available to C3 and distributed works featuring the assembly instructions and die line to its franchise locations.

To establish copyright infringement, KSM must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."   *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016).   Contributory copyright infringement is derivative of direct copyright infringement.   *Id*. at 1146.   It occurs "when the defendant causes or materially contributes to another's infringing activities and knows of the infringement."   *Id*. (quoting *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013)).   Thus, there can be no contributory infringement without a direct infringement.   *Id*. (citations and quotations omitted).

## A.      Character Copyrights

The parties' submissions with respect to the character copyrights implicate only the first element of an infringement claim—whether KSM owned the character copyrights.[3]  KSM asks the court to find as a matter of law that KSM was the sole owner of the character copyrights. SNS and C3, on the other hand, contend that factual issues exist as to the nature and extent of KSM's ownership of those copyrights.  According to defendants, SNS is a joint owner of the characters based on its contributions in the creative process and KSM did not own the Sizzle and Shaker copyrights in any event until April 2016.  For purposes of their motions for summary judgment, the parties do not dispute the "copying" element of KSM's infringement claims. Nonetheless, SNS and C3 contend that their copying of the characters was authorized by SNS's irrevocable, implied license to use the characters.  SNS and C3 move for summary judgment in their favor on the grounds that the license is irrevocable.  KSM asks the court to find as a matter of law that the license was revocable and was, in fact, revoked.

As will be explained law, the court concludes that KSM owns the Sizzle, Shaker and Goldie characters (and owned those characters from the time that they were created), but whether SNS is a joint owner of those characters must be resolved at trial.   The court further concludes that, to the extent SNS is not a joint owner of the characters, KSM granted SNS an unlimited, nonexclusive license to retain, use and modify the characters.  Finally, because the undisputed facts do not permit an inference that the implied license was supported by

---

[3] Defendants do not challenge the validity of the character copyrights.

consideration, the court concludes that the license was revocable and was revoked, at the latest, upon the filing of this lawsuit.

1.      *Ownership*

KSM seeks a ruling that it is the sole owner of the Sizzle, Shaker and Goldie characters. SNS asserts that summary judgment on this issue is inappropriate because facts exist from which a jury could conclude that SNS sufficiently contributed to the creation of the characters such that it is a joint owner of those characters. *See* 17 U.S.C. § 201(a) (authors of a joint work are co-owners of copyright in the work).  The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  In the absence of a written agreement establishing joint authorship, the party claiming joint authorship bears the burden of showing that each of the putative joint authors "(1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 (2nd Cir. 2015); *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009).[4]

In support of its argument, SNS contends that it made significant contributions to the creation of the characters and that the parties intended to be co-authors of the characters.  SNS directs the court to evidence demonstrating that SNS employees directed KSM's illustrators to incorporate certain elements into the characters.  SNS, for example, advised KSM to place the

---

[4] Although the Tenth Circuit has not set forth the elements pertinent to a showing of joint authorship, the parties agree that the court should apply the elements outlined by the Second and Seventh Circuits.

hamburger patty on top of the lettuce and tomato in the Sizzle character; specified the type of glass to use for the milkshake in the Shaker character; and proposed the idea of creating a female French fry character, which led to the Goldie character.  SNS has come forward with additional evidence of its contributions as well.  Specifically, SNS has provided evidence that it instructed a third-party illustrator to modify the characters in several respects.   These modifications, made at SNS's direction, included such things as adding shoes to Shaker's and Goldie's feet; changing the shape of Shaker's eyes; reducing the visibility of Shaker's top teeth; returning Sizzle's tongue to the interior of its mouth rather than protruding externally; adding white gloves to Sizzle's and Goldie's hands; repositioning Goldie's eyebrows; enhancing Goldie's eyelashes; and reshaping Goldie's left shoulder.  On the intent issue, SNS contends that KSM never attempted to restrict or limit any modifications made by SNS and never objected to any changes made by SNS.

KSM contends in reply—in almost summary fashion—that SNS's evidence is insufficient to preclude the entry of summary judgment in its favor on the ownership issue.  KSM asserts that SNS cannot be deemed a joint author because it admittedly contributed only "ideas" that, as a matter of law, are not independently copyrightable.  And KSM contends that any contributions made by the third-party illustrator on SNS's behalf are sufficient, at most, to confer joint authorship on that illustrator but not on SNS in the absence of a work-for-hire agreement.  KSM's arguments are not persuasive.[5]   While it is certainly true that "ideas" are not

---

[5]  The court summarily rejects KSM's suggestion at this juncture that the work of the third-party illustrator might be sufficient to confer joint authorship on that illustrator but not on SNS in the absence of a work-for-hire agreement.  To qualify for joint authorship, the contribution must be one of authorship rather than mere physical labor.  In other words, the creator of a work at

copyrightable, the "independently copyrightable" element is not read so restrictively. The Second Circuit has explained that the "independently copyrightable" element was intended to mean only that the co-author's contribution be "the product of authorship, i.e., expression" and not that the coauthor must be able to obtain a copyright on his or her separate contribution. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 n.3 (2d Cir. 2015). Similarly, Nimmer rejects an interpretation requiring that a contribution itself be "separately" copyrightable. 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.07[A] [3] at 6-21 (2013). And the Circuit Courts of Appeal clearly recognize that, under appropriate circumstances, a contributor of ideas may qualify as a joint author.[6]

In *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356 (7th Cir. 2009), the Seventh Circuit considered whether a song was a joint work. The plaintiff, Janky, wrote the music and lyrics for a song that was commissioned by the defendant to promote tourism in Lake County, Indiana. *Id.* at 359. Janky then showed the song to Farag, a member of her doo-wop group. Farag "recommended revising the lyrics to better suit the Bureau's vision." *Id.* Janky adopted Farag's recommendations and testified that those recommendations "accounted for 10

---

another's direction, without contributing intellectual modification, is not an author." 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.07[A] [2] at 6-20.1 (2013) (and cases cited therein). The record is not sufficiently developed to permit the court to conclude as a matter of law that SNS cannot be deemed an author of the contributions that were implemented by the third-party illustrator.

[6] The sole case cited by KSM in support of its argument that an "idea contributor" cannot qualify as a joint author is *Fred Riley Home Building Corp. v. Cosgrove,* 864 F. Supp. 1034 (D. Kan. 1994). That case arose in the context of a builder presenting ideas and concepts to an architect. There the court recognized that the builder's ideas were insufficient to confer joint authorship in the plans. As explained by Nimmer, courts considering the "idea contributor" in the architectural context have "soundly rejected" the proposition that a client or builder who contributed ideas to be used in plans qualifies as a joint author. *See Nimmer*, *supra*, § 6.07[A][3][b].

percent of the lyrical content." *Id.* at 360.  The Circuit ultimately concluded that Farag was a joint author of the song because Farag's contributions went "beyond general ideas, refinements, and suggestions":

> They were concrete expressions and thus pass the test of copyrightability where mere ideas fail.  In addition, while Farag's changes may have accounted for only 10 percent of the lyrics, they were significant.  They were important not only to the final sound, but also to its commercial viability.  Before Farag became involved, the song celebrated the charm of Indiana as a state; Farag shifted the focus to Lake County.  Without Farag's input, it is unlikely that the Bureau would have embraced the song the way it did.

*Id.* at 363. (citation omitted).  Similarly, the evidence here suggests that SNS contributed more than general ideas, but that SNS gave expression to those ideas through numerous, specific, concrete recommendations that were implemented in the final character illustrations.  *See Gaiman v. McFarlane*, 360 F.3d 644, 658-69 (7th Cir. 2004) (plaintiff, who provided verbal ideas for characters that were drawn by defendant, was entitled to joint authorship because his contribution, while perhaps not copyrightable by itself, had expressive content).   KSM, then, has not shown on this record that the nature and extent of SNS's contributions to the characters are insufficient to confer joint authorship on it.  *See Enterprise Management Ltd. v. Warrick*, 717 F.3d 1112, 1119 & n.7 (copyrightability is a mixed question of law and fact).

The court turns, then, to whether SNS and KSM "fully intended" to be co-authors.  KSM omits any discussion of this element from its reply.  Regardless, it is clear that factual issues exist that must be resolved at trial.   In analyzing whether SNS and KSM intended to be co-authors, it matters not whether the parties intended to recognize each other as co-authors for purposes of copyright law; "the focus is on the parties' intent to work together in the creation of a single product, not on the legal consequences of that collaboration."  *Janky*, 576 F.3d at 362.

There is certainly evidence from which a jury could conclude that the parties intended to work together to create a joint work.   The record suggests that SNS made more than minor suggestions that KSM felt free to disregard, but that SNS demanded numerous specific changes during the process and wielded "considerable control" over what the characters looked like at the end of the process.  *See id.*

Finally, SNS contends in response to KSM's motion that KSM does not own the Sizzle and Shaker copyrights in any respect and that SNS is, in fact, a joint owner of those copyrights with the illustrator of them.  The court rejects this argument.  The evidence demonstrates that KSM commissioned Michael Dammer, a freelance artist, to illustrate the Sizzle and Shaker characters in 2008.   KSM asserts in its motion that it owns the copyright to the illustrations created by Mr. Dammer because those illustrations were "made for hire."  The Copyright Act provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a).  However, if the work is made "for hire," the "person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).  Section 101 of the Copyright Act defines a "work made for hire" as "a work specially ordered or commissioned . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101(2). Mr. Dammer signed a work-for-hire agreement with KSM in April 2016—long after the creation and completion of the work.  According to KSM, that agreement memorialized the terms under which Mr. Dammer had previously agreed to perform the work.  Mr. Woodward testified that Mr. Dammer executed a written agreement prior to the creation of the illustrations, but that

KSM was unable to locate that agreement (as well as other Work for Hire agreements) after KSM relocated to its new facility.  While Mr. Dammer could not specifically recall signing a written agreement prior to April 2016, he confirmed in his deposition that the April 2016 written agreement memorialized what the parties had agreed to previously.

The Circuit Courts of Appeal are split as to whether the statute requires the writing before the creation (or at least the completion) of the work or whether a written agreement can post-date the creation of the work so long as it is memorializing an earlier oral agreement.  In *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992), the Seventh Circuit adopted a bright-line rule requiring that the parties must sign the work-for-hire agreement before the work is created in order for the agreement to be valid.  As explained by the Seventh Circuit:

> The requirement of a written statement regarding the copyright on a specially commissioned work is not merely a statute of frauds, although that is the purpose emphasized by the cases.  That is, it is not only designed to protect people against false claims of oral agreements.  If it were, then it might not matter when the statement had been made or signed, although there is authority that it must be signed before suit is brought.  This is an esoteric question, since ordinarily the absence of the requisite statement will lead to the dismissal of the suit before it can be tendered.  We need not try to resolve the question here.  For the signed-statement requirement in section 101(2) has a second purpose—to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable.  The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment or the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner.  The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally.  It did not precede it here.

*Id*. at 412-13 (citations omitted).  The Second Circuit, in *Playboy Enterprises, Inc. v. Dumas*, agreed with the Seventh Circuit to the extent that parties may not enter into work-for-hire agreements years after a work is created.  53 F.3d 549, 559 (2nd Cir. 1995).  But the Second

Circuit disagreed with the Seventh Circuit's conclusion that the actual writing memorializing the agreement must be executed before the creation of the work.  *Id*.  Looking to the Nimmers' treatise on copyrights, the Second Circuit emphasized that such a requirement could itself create uncertainty:

> [O]ne can . . . imagine claims involving parties each of whom knew of the unanimous intent among all concerned that the work for hire doctrine would apply, notwithstanding that some of the paperwork remained not fully executed until after creation of the subject work.  In that circumstance, the bright line rule could frustrate the intent of the parties, and cloud rather than serve the goal of certainty.

*Id*. (quoting 1 Nimmer § 5.03[B][2][b] (1994)).  Ultimately, the Second Circuit held that the writing requirement could be met by a writing executed after the work is created, if the writing confirms a prior agreement, either explicit or implicit, made before the creation of the work.  *Id*.

The Tenth Circuit has not addressed this issue.  Not surprisingly, defendants urge the court to adopt the Seventh Circuit's holding in *Schiller*, while KSM urges the court to adopt the approach followed by the Second Circuit in *Dumas*.  The two federal district courts that have squarely addressed the question have followed the Second Circuit's approach on the grounds that the Second Circuit is the "de facto Copyright Court of the United States."  *Looney Ricks Kiss Architects, Inc. v. Bryan*, 2010 WL 4068885, at *5-6 (W.D. La. Oct. 14, 2010) (accepting the Fifth Circuit's admonition that the Second Circuit is "the de facto Copyright Court of the United States" and adopting the Second Circuit's approach in *Dumas*); *Compaq Computer Corp. v. Ergonome Inc*., 210 F.Supp.2d 839, 842–844 (S.D. Tex. 2001) (same).  The court here does the same.  To begin, the Seventh Circuit's *Schiller* opinion cites no authority in support of its conclusion that the writing "must" precede the creation of the property.  The statute itself is

silent as to when the parties' written instrument must be executed.  Moreover, the Second Circuit's approach allows for a flexible, case-by-case inquiry into the existence of a work-for-hire agreement—an approach that the Tenth Circuit has adopted in other contexts when examining writing requirements under the Copyright Act.  *See SCO Group, Inc. v. Novell, Inc*., 578 F. 3d 1201, 1212-13 (10th Cir. 2009) (evaluating whether written instrument sufficient to transfer copyright ownership under § 204(a) and, citing *Nimmer* with approval, observing that "strict requirements" will not always aid predictability and certainty of copyright ownership; in the absence of support in statutory text, unwilling to read into writing requirement an "onerous" restraint on ability to transfer ownership).  The court, then, believes that this rule is the approach that the Circuit would adopt and applies it here.  In doing so, the court examines (1) whether the language of the agreement was sufficient to meet the writing requirement of § 101(2); (2) if so, whether KSM and Mr. Dammer understood at the time the illustrations for the assembly instructions were created that the works were made for hire; and (3) whether the agreement was signed by both parties.  *See Dumas*, 53 F.3d at 559 (finding these three questions relevant to whether valid work-for-hire agreement existed).

The answers to these questions demonstrate as a matter of law that KSM owned the illustrations made by Mr. Dammer.  The agreement, which is signed by Mr. Dammer and Mr. Woodward of KSM, expressly indicates that Mr. Kresge's prior and future "illustration services" commissioned by KSM constitute "work for hire" such that KSM is the "sole and exclusive owner" of those illustrations.  The plain language of the agreement further demonstrates that it memorializes the parties' understanding at the time the illustrations were created.  In that regard, the agreement confirms in writing that for "prior work completed," KSM is, "as agreed at the

15

time," the sole owner of the works.  Mr. Woodward's deposition testimony confirms that the written agreement memorialized the terms under which Mr. Dammer, prior to creating the works, had agreed to create the works, including the term that the works were made for hire. Similarly, Mr. Dammer confirmed in his deposition that the written agreement memorialized what the parties had agreed to long ago.  While defendants suggest that they doubt the veracity of whether an oral work-for-hire agreement existed at the time Mr. Dammer created the Sizzle and Shaker illustrations (or whether a prior written agreement truly existed), they have come forward with no evidence contradicting KSM's evidence on this point.  For the foregoing reasons, the court finds as a matter of law that KSM owns the Sizzle and Shaker characters.[7] Whether SNS is a joint owner of those characters must be resolved at trial.

2.   *Implied License*

If the jury concludes that SNS is a joint owner of the character copyrights, then SNS may use or license that work freely.  *See Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009).  To the extent, however, that the jury concludes that SNS is not a joint owner of the character copyrights, then SNS contends that its use was authorized in any event because KSM granted SNS an implied license to use the characters.  "The existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement." *Baisden v. I'm Ready Prods., Inc*., 693 F.3d 491, 499 (5th Cir.2012) (internal quotation marks omitted).  Although the Tenth Circuit has not yet had the occasion to address

_____

[7] Because the court finds as a matter of law that KSM owned the Sizzle and Shaker illustrations at all times, the court need not address defendants' argument that the work-for-hire agreement fails to assign to KSM past causes of action for infringement.

implied licenses in the context of copyright use, several Circuit Courts of Appeals have done so and the parties here do not dispute the elements required to establish an implied license. To establish an implied license, a party must show that "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)); *accord Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491 (5th Cir. 2012) (approving same elements but further stating that an implied license might arise in other circumstances, including circumstances where licensee had not asked copyright owner to produce copyrighted material). An implied nonexclusive license does not transfer ownership of the copyright to the licensee, but simply permits the use of a copyrighted work in a particular manner. *Shaver*, 74 F.3d at 775.

There is little, if any, dispute in this case about whether SNS had an implied license to use the characters created by KSM.[8] The real dispute concerns whether there was any limit on

---

[8] KSM's brief lacks clarity on this issue. On the one hand, KSM expressly states that it is "undisputed" that SNS enjoyed an implied license to use the characters, so long as that use was not "unfettered." On the other hand, KSM contends that no license existed at all because SNS cannot satisfy the first element of the test. Specifically, KSM contends that SNS did not request the characters from KSM, but that SNS simply agreed to KSM's initial idea to conduct a "character exploratory" to its presentation. That fact, standing alone, does not preclude the finding of an implied license. *Falcon Enterprises, Inc. v. Publishers Serv., Inc.*, 438 Fed. Appx. 579, 581 (9th Cir. 2011) (finding an implied license based on the parties' conduct despite the fact that licensor did not produce content at licensee's specific request); *accord* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A] [7] at 10-55 (2013) (it is "questionable" for courts to apply the three-factor rigidly and to hold that no implied license exists when one factor is absent). In light of the conduct of the parties in this case as described above, the court concludes as a matter of law that SNS had an implied license to use the characters created by KSM.

the scope of the license.  KSM, in essence, contends that SNS was entitled to use the characters only during the course of its relationship with KSM, while SNS contends that it was free to use the characters in connection with its kids' meal program and restaurant activities regardless of the existence of a continuing business relationship with KSM.  In resolving this issue, the court determines whether KSM intended to grant a license by considering the following factors:

> 1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (adopting factors utilized by First and Fourth Circuits).

Viewed in the light most favorable to KSM, the evidence does not permit an inference that KSM intended to limit the scope of the license to the duration of SNS's relationship with KSM or, stated another way, that KSM intended to condition the license on a continuing relationship with SNS.  There are no written contracts or documents providing that the characters could only be used with KSM's involvement or consent.  Moreover, it is undisputed that KSM never warned SNS against using or modifying the characters in any way and never advised SNS that it could only use the characters so long as SNS was purchasing products from KSM.  In fact, KSM never communicated any limitations whatsoever on SNS's use of the characters.  KSM did not object when SNS trademarked the characters in April 2012 and complied with SNS's request to include trademark registration markings on future projects.  According to plaintiff's allegations in the pretrial order, SNS's trademarks remain in force for

18

10 years. KSM did not object when SNS used the characters in its dealings with third-party vendors, including projects involving t-shirts, bus signs, cups, placemats, costumes and plush replicas that were not produced by KSM.[9] In fact, the first time that KSM raised any concerns about SNS's use of the characters was in May 2014 when SNS notified KSM that it had decided to move its kids' program marketing business (and, more specifically, its paperboard car business) to defendant Creative Consumer Concepts, Inc.

KSM contends that the license was limited in scope because KSM, on all but one occasion, included a copyright notice on the artwork and products it created incorporating the characters. But simply including a copyright notice does not negate SNS's license to use the products. KSM's use of the copyright notice simply speaks to KSM's intent to retain copyright ownership over the characters—an intent that is not inconsistent with its right, as the copyright owner, to grant a license to SNS. *See Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) (use of copyright notice has no bearing on existence or scope of implied license). KSM also complains that SNS never sought permission from KSM to modify the characters on products created by other parties. But nothing in the parties' course of conduct suggests that KSM's consent was required in connection with SNS's use of the characters or that SNS was precluded from modifying the characters. *See id.* (unless licensor expresses an intent to retain control over work and limit the license, assumption is that an unlimited license to retain, use and modify work exists).

---

[9] While some of these transactions involved KSM directly providing the artwork to the third-party vendors (which might indicate an intent to maintain control over the work), several transactions occurred between SNS and third-party vendors without KSM's involvement. In those instances, KSM never objected to SNS's use of the characters.

In sum, KSM never expressed any intent to retain control over the characters or to limit SNS's use of the characters to the duration of the parties' relationship. KSM's belated contention, made for the first time after SNS's decision to move its work to a competitor, that the characters could not be used if SNS terminated its relationship with KSM, is not sufficient to negate all other objective manifestations of intent to grant SNS an unlimited license. *See id*. For the foregoing reasons, then, the court concludes that KSM granted SNS an unlimited, nonexclusive right to retain, use and modify the characters.

One final issue remains with respect to SNS's implied license. SNS contends that it is entitled to summary judgment on KSM's claims concerning the character copyrights because the implied license was supported by consideration and, accordingly, was irrevocable such that any and all use by SNS is authorized. KSM, on the other hand, contends that the license was revocable and, in fact, was revoked upon the filing of this lawsuit such that any use by SNS after the filing of the lawsuit was and is unauthorized. As explained below, the undisputed facts do not permit an inference that the implied license was supported by consideration. The court concludes, then, that the license was revocable and was revoked, at the latest, upon the filing of this lawsuit.

Implied licenses are revocable absent consideration and, thus, are irrevocable if supported by consideration. *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008); *Carson v. Dynergy, Inc*., 344 F.3d 446, 451-52 (5th Cir. 2003); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.02[B] [5] at 10-28.6 (2013). The parties vigorously dispute whether KSM received consideration for the implied license given to SNS. In support of its motion,

SNS directs the court to the following evidence which, according to defendants, demonstrates that SNS paid for the license to the characters:

     •    In October 2009, SNS paid KSM $5200 for "creative services" rendered in connection with a placemat that KSM designed for use in SNS's restaurants.   The double-sided placemat included a menu of available kids' meals, drinks and milk shakes as well as activities and illustrations of the characters and food items.

     •    In November 2009, SNS paid KSM $1040 for "creative services" rendered in connection with a kids' paper cup that KSM designed for use in SNS's restaurants.  The artwork on the cup included Sizzle, Shaker and Goldie as well as additional branding elements from SNS, including a restaurant building, a signpost with the SNS logo and a checkerboard design associated with the SNS brand.

     •    KSM included the characters on paperboard cars and other products it designed and supplied for SNS, and the "cost of the mascots" was "baked in" to the price of the products sold to SNS.[10]

With respect to the SNS's payments in October and November 2009, there are no facts from which a jury could reasonably conclude that SNS was paying for anything other than the specific services (creating artwork for placemats and cups) described in the job orders for those products.  The invoice for the placemat work reflects that SNS paid KSM for 80 hours of work associated with the placemat artwork at a rate of $65.00 per hour.  The "creative services" provided by KSM are expressly limited to "SNS—Nov-Dec Kids Menu Placemat."  This evidence, then, reflects only that SNS, in paying the $5200 invoice, was paying for the hours that KSM spent on the placemat artwork—integrating the characters, creating other illustrations and incorporating additional branding elements into the artwork for the placemat.  Similarly, the invoice for the cup work reflects that SNS paid KSM for 16 hours of work associated only with

---

[10] Although the court refers to the Sizzle, Shaker and Goldie illustrations as "characters," the parties have generally referred to those characters as "mascots."

the cup artwork at a rate of $65.00 per hour.  The "creative services" provided by KSM are expressly limited to "SNS Kids Cup Artwork."

The record is devoid of any evidence that these payments were made, in whole or in part, for the creation of the characters themselves (which, in fact, were created long before the placemat and cup orders) or for a license to use the characters beyond the placemats and cups specifically described in the job orders.  Moreover, SNS's argument is inherently flawed—if in fact SNS's payment in October 2009 constituted consideration for an "irrevocable" license, then any November 2009 payment for the license was obviously unnecessary.  Defendants, then, have come forward with no evidence from which a jury could determine that the October 2009 or November 2009 payments could reasonably be construed as payment for an unlimited, implied license.

That leaves only defendants' argument that the "cost of the mascots" was "part of the baked-in price" that SNS paid for the paperboard cars and other products it purchased featuring the characters.[11]  This argument essentially mirrors defendants' other arguments—that when SNS paid for the artwork on specific products, it was paying for an unlimited license to use those characters.  But nothing in the evidence cited by SNS reflects that any payment made by SNS for artwork or creative services associated with specific products constituted consideration for the specific licensing right to use the characters in any and all other contexts.  SNS's evidence reflects only that KSM considered the "costs" associated with creating the characters when determining KSM's budget for the paperboard cars and that KSM routinely offers pricing

---

[11] The "baked-in price" language comes from a deposition question posited by defense counsel during the deposition of Mr. Tindall.

to clients that includes the costs of creative services.  So while KSM might have "baked in" to the contract price the costs incurred by KSM in terms of time spent creating the characters or the artwork for specific products, that fact does not support an inference that those "costs" somehow included payment for an unlimited license to use the characters.  Contrary to defendants' characterization of KSM's argument, the court is not requiring as evidence an invoice that includes a separate line item for the license, but neither can the court permit a jury to infer an irrevocable license based solely on the fact that SNS paid for the time and money it cost KSM to develop the products ordered by SNS.  SNS, then, has failed to raise any disputed factual issues concerning whether the license granted by KSM was supported by consideration.  The court concludes, then, that the license enjoyed by SNS was revocable and was revoked, at the latest, upon the filing of this lawsuit.  See Cynthia Hunt Productions, Ltd. v. Evolution of Fitness Houston Inc., 2007 WL 2363148, at *6 (S.D. Tex. Aug. 16, 2007) (nonexclusive license revoked by filing copyright infringement lawsuit); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (institution of infringement lawsuit constitutes revocation of implied license).[12]


**B.     Assembly Instructions Copyright**

The parties' submissions with respect to the assembly instructions copyright similarly implicate only the first element of an infringement claim—KSM's "ownership" of a "valid"

---

[12] In their reply in support of their motion for summary judgment, defendants assert for the first time that the license was supported by consideration by virtue of SNS's hiring of KSM for services and products.  The court will not consider this argument. *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).

copyright.  KSM asks the court to find as a matter of law that KSM was the sole owner of the assembly instructions copyright.  SNS and C3, on the other hand, contend that factual issues exist as to the nature and extent of KSM's ownership of that copyright.  According to defendants, KSM did not own the assembly instructions copyright until the third-party artist who illustrated each of the instructional steps executed a work-for-hire agreement in April 2016. Moreover, both parties have moved for summary judgment on the issue of whether the assembly instructions copyright is valid.  KSM contends that the copyright is valid as a "pictorial or graphic" work under 17 U.S.C. § 102(a)(5).  Defendants assert that the assembly instructions are not entitled to copyright protection because those instructions (including the illustrations) are strictly functional.   Finally, defendants move for summary judgment on the grounds that KSM is not seeking damages or any other remedy based on defendants' infringement of the assembly instructions copyright.

As explained in more detail below, the court concludes as a matter of law that KSM is the sole owner of the assembly instructions copyright and that it owned that copyright at all times. The court further concludes that defendants have not rebutted the presumption of validity with respect to the illustrations contained in the assembly instructions copyright, but that defendants have established that the copyright in the written instructions is not valid.   Finally, the court rejects defendants' argument that KSM is not seeking damages or any other remedy based on defendants' infringement of the assembly instructions copyright.

*1.      Ownership of the Copyright*

24

The assembly instructions for the paperboard cars were developed by two individuals. Mr. Billen of KSM authored the verbiage for each of the eight separate assembly steps.  Each of those eight assembly steps were illustrated by James Kresge, a freelance artist.   KSM asserts in its motion that it owns the copyright to the illustrations created by Mr. Kresge because those illustrations were "made for hire."  But, similar to the situation discussed above with respect to Mr. Dammer, Mr. Kresge did not sign a work-for-hire agreement with KSM until April 2016, after the creation and completion of the work.  According to KSM, that agreement memorialized the terms under which Mr. Kresge had previously agreed to perform the work.  Mr. Woodward testified that Mr. Kresge executed a written agreement prior to the creation of the illustrations, but that KSM was unable to locate that agreement either after KSM relocated to its new facility.

For the reasons explained above in connection with the agreement executed by Mr. Dammer, the court applies the rule adopted by the Second Circuit in *Dumas*—that is, that § 101(2)'s writing requirement may be met by a writing executed after the work is created, if the writing confirms a prior agreement, either explicit or implicit, made before the creation of the work.   Applying that rule, the court concludes as a matter of law that KSM owned the illustrations made by Mr. Kresge.  The agreement, which is signed by Mr. Kresge and Mr. Woodward of KSM, expressly indicates that Mr. Kresge's prior and future "illustration services" commissioned by KSM constitute "work for hire" such that KSM is the "sole and exclusive owner" of those illustrations.  The plain language of the agreement further demonstrates that it memorializes the parties' understanding at the time the illustrations were created.  In that regard, the agreement confirms in writing that "for prior work completed," KSM is, "as agreed at the time," the sole owner of the works.  Mr. Woodward's affidavit confirms that the written

agreement memorialized the terms under which Mr. Kresge, prior to creating the works, had agreed to create the works, including the term that the works were made for hire. While defendants, as they did above in connection with Mr. Dammer's agreement, suggest that they doubt the veracity of whether an oral work-for-hire agreement existed at the time Mr. Kresge created the illustrations for the assembly instructions (or whether a prior written agreement truly existed), they have come forward with no evidence contradicting KSM's evidence on this point. For the foregoing reasons, the court finds as a matter of law that KSM is the sole owner of the assembly instructions copyright.[13]

2.    *Validity*

As noted above, the assembly instructions for the paperboard cars are comprised of two parts—textual instructions set forth in eight steps and eight drawings or graphics that illustrate those eight assembly steps. It is undisputed that KSM, in February 2015, obtained a certificate of registration with respect to the assembly instructions. The Copyright Act expressly provides that a certificate of registration issued before or within five years of the first publication of the work constitutes prima facie evidence of the validity of the copyright. *See* 17 U.S.C. § 410(c). When evaluating an application for a certificate, the Copyright Office performs a "substantive examination within its particular expertise to determine validity:  whether the work falls within the subject matter of copyright":

---

[13] Because the court finds as a matter of law that KSM owned the illustrations at all times, the court need not address defendants' argument that the work-for-hire agreement fails to assign to KSM past causes of action for infringement.

> The Office will register only works as to which, "after examination," it determines that the material deposited constitutes copyrightable subject matter. The Office will decline to register materials that it deems outside the scope of copyright protection.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.11[B][3] at 12-207 (2013) (citing 17 U.S.C. § 410(a)). Thus, the section 410(c) presumption of validity is in place and the burden is on defendants to rebut that presumption. *See Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005). To rebut the presumption, defendants "must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case" of validity. *Id.*[14]

In its submissions, KSM concedes that the textual instructions are not entitled to copyright protection as those instructions, as written, are purely functional. *See, e.g., Tomaydo-Tomahhdo, LLC v. Vozary*, 629 Fed. Appx. 658, 661 (6th Cir. 2015) (functional directions are statutorily excluded from copyright protection); *National Nonwovens, Inc. v. Consumer Products Enterprises, Inc.*, 397 F. Supp. 2d 245, 256 (D. Mass. 2005) (written instructions on how to boil wool were not entitled to copyright protection in the absence of any stylistic flourishes or other forms of creative expression that somehow transcend the functional core of the directions); 17 U.S.C. § 102(b). The parties dispute whether the illustrations accompanying the textual instructions are subject to copyright protection. Defendants urge that the illustrations are unprotectable "scènes à faire" that are driven exclusively by and flow naturally from considerations related to the car's design rather than the author's creativity. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[B][4] at 13-88.6 (2013) (scènes à

---

[14] KSM does not suggest that the Copyright Office's decision to issue the certificate is entitled to any particular deference.

faire—scenes which "must be done"—refer to incidents, characters or settings which are indispensable, or at least standard, in the treatment of a given topic).   In a related vein, defendants contend that the merger doctrine precludes copyright protection for the illustrations. KSM urges that neither scènes à faire nor the merger doctrine apply to the illustrations, which reflect a myriad of stylistic choices concerning whether and how to depict each of the eight assembly steps.   KSM, then, contends that the illustrations are protected from infringement.

1.   Scènes à Faire

Defendants contend that the illustrations are excluded from copyright protections under the scènes à faire doctrine.   Under the scènes à faire doctrine, expressive elements of a work of authorship are not entitled to protection against infringement "if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting."   *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997) (citation omitted).   By way of example, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," and are unprotectable scènes à faire.   *Id*. at 1374-75 (citation and quotation omitted).   The Tenth Circuit has extended the scènes à faire doctrine in the context of computer programs to exclude from protection those elements of a work that necessarily result from external factors inherent in the subject matter of the work.   *Id*. at 1375.[15]

---

[15] As explained by Nimmer, the doctrine of scènes à faire  applies particularly to computer programs because "in many instances, it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques."   *See Nimmer*, *supra*, § 13.03[F][3] at 13-127.

Defendants assert that the assembly illustrations are unprotectable scènes à faire because the images and arrows flow naturally from the steps necessary to assemble the paperboard cars—that the car must necessarily be assembled a certain way due to the car's design.   In support of this argument, defendants rely primarily (if not exclusively) on *Gennie Shifter, LLC v. Lokar, Inc.*, 2010 WL 126181 (D. Colo. Jan. 12, 2010).   While *Gennie Shifter* might support the conclusion that the written assembly instructions are not protectable, it does not support the conclusion that the illustrations are not protectable.   In that case, both parties manufactured transmission shifters and transmission shifter accessories.   *Id*. at *2.   The plaintiff began manufacturing its "Lo-Dapt Shifter Knob Adapter" which was similar to a Shifter Knob Adapter manufactured by the defendant.   *Id*.   The defendant did not hold a design patent for its Shifter Knob Adapter, but sent the plaintiff a cease and desist letter alleging that the plaintiff had violated, among other things, copyrights held by the defendant for the contents of the installation instruction sheet accompanying the Shift Knob Adapter.   *Id*.   Ultimately, the plaintiff filed suit seeking a declaratory judgment that it had not infringed the defendant's copyrights.   *See id*.

On the parties' cross-motion for summary judgment, the district court held that the installation instructions were not protectable under the scènes à faire doctrine.   *Id*. at *5.   In doing so, the court explained that the instructions were "merely the recitation of the mechanical steps and parts dictated by the installation process" without sufficient creative expression.   *See id*. at *6.   The court did not discuss—and the parties' arguments apparently did not address— any illustrations accompanying the written instructions.   Contrary to defendants' suggestion, then, *Gennie Shifter* does not have "highly analogous" facts to those set forth here.   While the

29

seven-step instructions quoted by the district court direct the reader to certain figures,[16] it is not clear from the court's opinion that those figures were included the instruction sheet before the court (as opposed to a separate sheet) or that the defendant even claimed a copyright in the illustrations. *See id.* at *5-6. There is simply no discussion with respect to any illustrations whatsoever and it cannot reasonably be inferred from the opinion, as defendants argue, that the court denied protection to "graphical" installation instructions.

Defendants, then, have not established that the scènes à faire doctrine precludes protection of the assembly illustrations. While the paperboard car necessarily must be assembled in a certain fashion in light of the car's specific design, the specific illustrations that support that assembly (as opposed to the written instructions outlining the assembly) do not *necessarily* follow from that assembly rather than from the author's creativity. The illustrations reflect a creative decision to depict a white, unadorned car against a black background with red arrows indicating specific folds and insertion points. The illustrations depict the car as a three-dimensional object from a specific vantage point. These creative decisions were made from numerous choices about whether and how to illustrate the specific assembly steps. Moreover, while the illustrations are certainly helpful to assembling the paperboard car, it cannot be said that the illustrations are required for assembly, particularly in light of the written instructions. In short, there is nothing "standard" about the illustrations. There is no basis, then, to conclude that the illustrations constitute scènes à faire. *See Nimmer,* supra, § 13.03[B][4] (scènes à faire refers to the notion that less copyright protection is afforded to incidents, characters or settings which

---

[16] For example, Step 2 of the instructions states: "Install the jam-nut from the kit onto the shifter lever; run down to bottom of threads on shifter lever. Fig. 2. "

are as practical matter "indispensable, or at least standard, in the treatment of a given topic.");

*Tetris Holding, LLC v. Xio Interactive, Inc*., 863 F. Supp. 2d 394, 405-06 (D.N.J. 2012)

(diagrams, charts and graphical works associated with games are unprotectable only when the

game is "useless" without the accompanying diagram, chart or illustration; scènes à faire

doctrine has "little weight" in context of games that have "no grounding in the real world"

because "there are no expressive elements 'standard, stock, or common' to a unique puzzle

game that is divorced from any real world representation"); *Compaq Computer Corp. v.

Ergonome, Inc*., 137 F. Supp. 2d 768,776- 77 (S.D. Tex. 2001) (rejecting application of scènes à

faire doctrine for illustrations accompanying written directives concerning correct and incorrect

hand positions relating to a computer keyboard; the specific, detailed illustrations displayed

enough originality to separate it from mere generic expression and ideas could be expressed in

various ways).[17]

2.    Merger Doctrine

While "pictorial, graphic, and sculptural works" are generally copyrightable, the

protection does not "extend to any idea, procedure, process, system, method of operation,

concept, principle, or discovery" regardless of the form in which it is described, explained,

illustrated, or embodied in such work.  *Enterprise Management Ltd. v. Warrick*, 717 F.3d 1112,

1117 (10th Cir. 2013) (quoting 17 U.S.C. § 102(a)(5) & (b)).  "In short, the copyright law is not

---

[17] Even if the illustrations are treated as scènes à faire, they would nonetheless receive protection
from identical copying.  *See Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015
(7th Cir. 2005).

a patent law:  it protects the expression of ideas rather than the underlying ideas themselves." *Id*. (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 344–45 (1991) ("The most fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates.")).  When a "work expresses an idea in the only way it can be expressed, courts deny those expressions protection under the 'merger doctrine' to avoid giving the author a monopoly over the underlying idea.  *Id*. (citing *Gates Rubber Co. v. Bando Chem. Indus*., 9 F.3d 823, 838 (10th Cir. 1993)).  "Conversely, when an idea is capable of many different 'modes of expression,' the expression of the idea is eligible for copyright protection."  *Id*. (quoting *Apple Computer, Inc. v. Franklin Computer Corp*., 714 F.2d 1240, 1253 (3d Cir. 1983)).

Defendants argue that the merger doctrine precludes protection of the assembly illustrations.  According to defendants, if the illustrations are protected, then plaintiff will enjoy a monopoly on the idea of a paperboard car because one cannot make a paperboard car without the illustrations.  The court rejects this argument.  In producing and selling their paperboard cars, defendants could have described, through pictures or images, the assembly process in numerous ways.  Defendants could have utilized photographs of the actual paperboard cars at the various stages of assembly.  To the extent defendants wanted to use illustrations, they could have incorporated various colors and details into those illustrations, instead of the unadorned, white car utilized by KSM.  They could have depicted only a portion of the car as opposed to the whole car that KSM decided to depict.  They could have depicted the car from a different vantage point.  Because there are numerous ways to illustrate the proper assembly of the car, KSM's expression in this respect does not "merge" with the idea of the car itself.   In other words, because KSM's creative choices with respect to illustrating the assembly instructions do

not foreclose other ways of explaining those instructions, there is no merger. *See id.* at 1117-18 (no merger where plaintiff's diagram expressed an idea but defendant could express the same idea in his own fashion).

For the foregoing reasons, defendants have not effectively rebutted the presumption of validity of KSM's copyright in the assembly illustrations.   KSM's motion for summary judgment on the validity of the illustrations is granted and defendants' motion on that same issue is denied.  With respect to the written instructions, however, defendants' motion for summary judgment is granted.

*3.      Remedy*

Defendants also move for summary judgment on KSM's infringement claim relating to the assembly instructions copyright on the grounds that KSM, in the pretrial order, has sought no remedy for the alleged infringement.  The court rejects this argument.  In the pretrial order, KSM seeks damages measured by its lost profits on sales of "five-panel paperboard cars featuring the Sizzle, Shaker and/or Goldie characters."  Contrary to defendants' argument, the court does not read this sentence as limiting KSM's damages to those arising from infringement of the character copyrights.  The pretrial order clearly states that the infringement claim is based, in part, on the Spy Series cars which include KSM's assembly instructions and were manufactured using KSM's Concept Car die line.  While the "Damages" portion of the pretrial order does not specifically reference the assembly instructions or die line copyrights by name or registration number, that omission, in light of the overall context of the pretrial order and the

33

nature of KSM's claims, simply does not suggest that KSM is not seeking a remedy with respect to those copyrights.

## C.    Die Line Copyright

KSM undisputedly created the die line for its Futuristic Cars series of paperboard cars.  A die line is a template used in the manufacturing process in which a steel cutting die is created to form cuts, folds and perforations in specific places dictated by the template.   The parties' submissions with respect to the die line copyright focus on the validity of the copyright.[18]  It is undisputed that KSM, in August 2014, obtained a certificate of registration with respect to the die line.   As noted earlier, then, a presumption of validity is in place and the burden is on defendants to rebut that presumption by offering some evidence or proof to dispute or deny KSM's prima facie case of validity.  *See Palladium Music, Inc. v. EatSleepMusic, Inc*., 398 F.3d 1193, 1196 (10th Cir. 2005).

KSM contends that the die line template is eligible for copyright protection as a "pictorial or graphic" work under 17 U.S.C. § 102(a)(5).  Defendants assert that the paperboard car is a "useful article" that is excluded from copyright eligibility; that the die line is, in fact, the paperboard car in flattened, unassembled form; and, accordingly, that the die line is itself a useful article.   A "useful article" is defined in the Copyright Act as "an article having an

---

[18] KSM moves for summary judgment on the issue of its sole ownership of the die line copyright, which is undisputed by defendants.  That aspect of KSM's motion, then, is granted. Defendants move for summary judgment on the grounds that KSM is not seeking damages or any other remedy based on defendants' infringement of the die line copyright.  For the reasons discussed above in connection with the assembly instructions copyright, this argument is rejected.

intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *See* 17 U.S.C. § 101.  The court rejects this argument for two reasons.

First, defendants' argument is premised on the conclusion that the paperboard car is a useful article.  The court rejected that argument at the motion to dismiss stage and defendants have failed to demonstrate why the court should reconsider that decision.  *See Kid Stuff Marketing, Inc. v. Creative Consumer Concepts, Inc.*, 2015 WL 3485759, at *4 (D. Kan. June 2, 2015) (plaintiff's paperboard car, which was intended merely to portray a real car and has no intrinsic utilitarian function, is not a useful article and would be copyrightable); *accord* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2A.14[A] at 2A-197 (2013) (because toys do not have an intrinsic function other than the portrayal of the real item, they do not qualify as useful articles).[19]

Second, defendants' argument assumes that the die line is indistinct from the paperboard car itself.  According to defendant, the die line "is the sheet of semi-rigid material" that is folded into the car.  The record does not support this conclusion.  Rather, the record reflects that the function of the die line is merely to convey information to the manufacturer for purposes of the die-cutting process.  The die line is simply an image or graphic that tells the manufacturer where and how to cut the car from the sheet of paperboard and where additional, internal cuts or

---

[19] According to defendants, the record reflects that that the paperboard car may be used as a "carton for food" such that it has a function apart from portraying a real car.  But courts have held that toys can qualify for copyright protection even where there is some mechanical or functional element to the toy.  *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 709 (9th Cir. 2010) (citing cases).  Even assuming, however, that the court were inclined to find a factual issue on whether the paperboard car is a "useful article," defendants' argument nonetheless fails for the independent reason that the die line is entirely distinct from the car itself.

perforations should be made and where fold lines should be formed. The unassembled, flattened form of the car that is ultimately presented to the consumer is not created until the completion of the die-cutting process.

Defendants, then, have not demonstrated that KSM's die line is ineligible for copyright protection. Summary judgment on this issue is granted in favor of KSM. *Compare Ellison Educational Equipment, Inc. v. Chen*, 2004 WL 3154592, at *6-8 (C.D. Cal. Dec. 21, 2004) (concluding that plaintiff's die designs were eligible for copyright protection and that defendant infringed by copying certain, specific designs); *and Ellison Educational Equipment, Inc. v. Tekservices, Inc.*, 903 F. Supp. 1350, 1359-60 (D. Neb. 1995) (issuing injunction where competitor's die designs were substantially similar to plaintiff's designs); *with Ellison Educational Equipment, Inc. v. Accu-Cut Systems, Inc*., 769 F. Supp. 1090, 1101-02 (D. Neb. 1991) (copyright protection did not extend to die designs that were silhouettes of "ordinary, common items" such as a dog bone, an apple and a sun because where were an extremely finite number of ways to alter those shapes such that copyright protection would grant the plaintiff a monopoly).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion for partial summary judgment (doc. 111) is granted in part and denied in part; defendants' motion for summary judgment (doc. 114) is granted in part and denied in part; and defendants' motion for oral argument (doc. 132) is denied.

**IT IS SO ORDERED.**


Dated this 19th day of December, 2016, at Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge